UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIO CAVIN,

    Plaintiff,                                         Civil Action No. 15-CV-14449

vs.                                                   HON. BERNARD A. FRIEDMAN

MICHIGAN DEPARTMENT
OF CORRECTIONS,

    Defendant.

_____/

## OPINION AND ORDER ON REMAND

In accordance with the June 17, 2019, opinion and judgment of the United States Court of Appeals for the Sixth Circuit, the Court hereby addresses the only remaining issue in this case – whether the policy restricting certain religious practices, imposed and enforced by defendant Michigan Department of Corrections ("MDOC"), survives strict scrutiny under the Religious Land Use and Institutionalized Persons Act ("RLUIPA").[1]

The Sixth Circuit summarized the facts of this case as follows:

> The Michigan prisons allow Wiccan inmates to worship as a group for eight major holidays known as Sabbats, which occur periodically throughout the year. Wiccans celebrate other holidays, called Esbats, each lunar month, approximately twelve to thirteen times a year. Cavin wishes to worship with his co-religionists on Esbats. When Cavin observes Esbats by himself in his cell, he faces

---

[1] There are three prongs of the relevant test under RLUIPA: (1) "the inmate must demonstrate that he seeks to exercise religion out of a sincerely held religious belief"; (2) the inmate "must show that the government [policy] substantially burden[s] that religious exercise"; and (3) "the government must meet the daunting compelling-interest and least-restrictive-means test." *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019). At the bench trial of this matter, the Court found that the first prong was established, but it did not address the final prong wherein strict scrutiny is applied to the government policy. Rather, the Court found that the MDOC policy did not substantially burden plaintiff's religious exercise, thus ending the analysis at the second prong. *See* Bench Trial Tr. at 71-74. The court of appeals disagreed with this conclusion and directed this Court to consider the third prong on remand.

> additional drawbacks. The prison permits Wiccan inmates to use candles and incense only in the prison's chapel, so Cavin cannot access the items that he needs for rituals. And if his cellmate proves unfriendly, Cavin has trouble conducting religious rites.
>
> Cavin asked the Department of Corrections to allow him and other Wiccans to celebrate Esbats together. Officials denied his request. In response, he filed this lawsuit, requesting injunctive relief under the Religious Land Use and Institutionalized Persons Act (known as RLUIPA to most lawyers). He also sought damages from the Department and Chaplain David Leach, who oversees the Department's religious programming.
>
> At summary judgment, the court ruled that Eleventh Amendment immunity barred the damages claims against the Department; that Chaplain Leach deserved qualified immunity; and that only Cavin's RLUIPA claim for religious accommodation could proceed.
>
> After a bench trial, the court rejected Cavin's RLUIPA claim for injunctive relief, concluding that the prison's regulations implicate but do not burden Cavin's exercise of religion.

*Cavin*, 927 F.3d at 457-58.

The court of appeals determined that "the Department's policy burdens Cavin's desired religious exercise," *id*. at 458, and remanded for a determination as to "whether [MDOC's] policy prohibiting communal Esbat worship passes strict scrutiny." *Id*. at 459. Both parties have submitted briefs on remand [docket entries 83, 85, and 86] addressing this issue.

"RLUIPA prohibits a State from imposing a substantial burden on the religious exercise of a person residing in or confined to an institution unless the government shows that the burden furthers a compelling governmental interest and is the least restrictive means of doing so." *Id*. at 458. The MDOC argues that it has a compelling interest in placing some restrictions on the manner in which Wiccans exercise their religious freedom, and that the restrictions embodied in MDOC Policy Directive 05.03.150 ("Religious Beliefs and Practices of Prisoners") are the least restrictive means

sufficient to protect that interest.[2]  "While the Department permits Cavin and other Wiccans to

---

[2] In relevant part, MDOC Policy Directive 05.03.150 permits "group services/activities" under the following conditions:

> V. Group religious services shall be offered at all institutions for prisoners belonging to a recognized religious group. Except as set forth in Attachment A, each group shall be allowed a weekly religious service if resources permit. However, a service is not required to be conducted if there are less than five prisoners within the same security level of that institution who actively participate in the religious activities of a group. If resources such as time or space are limited, the following shall be followed in allotting available resources:
>
>> 1. Each major faith group within the same custody level of an institution may be required to hold joint services; e.g. there may be one non-sectarian service for Christian prisoners, one for Islamic prisoners, one for Jewish prisoners, and one for Native American prisoners.
>>
>> 2. The Warden or designee may establish a maximum number of hours which will be available per week or month for group religious services and activities and divide those hours among recognized religious groups at his/her institution. While preference may be given to those recognized religious groups with the larger numbers, all recognized religious groups shall be allowed at least some opportunity for group services.
>
> W. There shall be at least one suitable area designated for conducting group religious services and activities within each institution. Staff shall have access to any area where group religious services or activities are being conducted. However, staff shall be as respectful of religious practices as possible, consistent with necessary custody and security controls. These areas shall be subject to search, which shall be conducted in the presence of the Chaplain, if possible. However, searches shall not be delayed if a Chaplain is not readily available. Care should be taken so that items which have been consecrated or are considered sacred are treated with respect and appropriate care.
>
> X. A prisoner shall not possess or have control over candles, candle holders, lighters, or any incendiary device used during group religious services or activities. These items must remain under control of staff or volunteer clergy at all times while in use. In addition, there must be in-room staff supervision of group religious services or activities whenever a candle is used.

3

congregate on some holidays, it prevents their group worship on others and limits their use of ritualistic items when alone."³ *Id.* at 457. The former restriction – the limit on the number of MDOC-recognized Wiccan holy days on which faith members are allowed to gather – is the subject of this suit. *See id*. at 459 (noting that "the nature of what Cavin seeks to do [is] worship with others according to his beliefs."). *See also* Compl. at 4. Therefore, the narrow issue before the Court is whether MDOC Policy Directive 05.03.150, which permits Wiccans to worship communally on eight specified days per year, unduly restricts plaintiff's desire to worship communally, as he seeks to worship with fellow Wiccan inmates on twelve or thirteen additional days per year.

Defendant contends that two primary prison administration interests are at stake: "[f]irst, maintaining safety and security of its facilities, and second [preserving the] limited staff, space,

---

> Y. In Level IV and V, group religious services and activities shall have continuous in-room staff supervision at all times. Subject to Paragraph X, group religious services and activities in Level I and Level II shall have at least random in-room staff supervision; however, every effort shall be made to have continuous in-room staff supervision when a religious service is being led by a prisoner assistant . . . . In all other cases, the Warden shall determine the need for in-room staff supervision for group services and activities. However, staff must be readily available in the area when in-room staff supervision is not required. Staff providing in-room supervision shall remain in the room where the service or activity is being conducted during the entire service or activity. To ensure that prisoners are engaging only in conduct appropriate to the practice of the religion, staff providing in-room supervision shall listen to and watch those attending the service or activity. This supervision shall be as unobtrusive as possible, consistent with custody and security controls.

*Id*. at ¶¶ V-Y.  *See* Def.'s Br. Ex. 1, at PageID.707-08. Attachment A of MDOC Policy Directive 05.03.150, which provides a list of "recognized religious groups authorized to conduct group religious services/activities," includes Wicca and references the eight annual Wiccan communal services. *See* Def.'s Br. Ex. 1, at PageID.716.

³ The ritualistic items at issue include candles and incense, which the MDOC does not allow prisoners to use outside of the prison's chapel. *See Cavin*, 927 F.3d at 458. *See also* Bench Trial Tr. at 21.  However, the only issue before the Court is whether the MDOC policy unduly restricts plaintiff's right to communal gatherings, not his right to use ritualistic items.

and program resources." Def.'s Br. at 3. Among the relevant safety concerns, defendant lists "misuse of religious property to cause harm, possession and exchange of contraband during services, gang activity, and potential for prisoner violence." *Id*. at 4. Regarding the strain on the MDOC's limited resources, defendant states that staff are always required to supervise prisoner programming, and that "whenever staff is required for supervision of religious group services . . . this impacts supervision in other areas of the facility, leading to an increase of prisoner violence and smuggling of drugs and weapons." *Id*. at 5-6. Defendant adds that, regardless of the risk of violence, the need to conserve MDOC's resources is a compelling interest in its own right. Defendant states that "the MDOC must accommodate prisoners in all forms of programming (religious and non-religious), at over 25 facilities, with limited space. The MDOC offers over 20 non-religious prisoner programs, and at some facilities[] it is not uncommon to provide over 100 religio[us] programs on a weekly basis." *Id*. at 6. For safety reasons, all such programs must occur in two designated buildings located within each facility – "the programs and educational buildings." *Id*. In addition to limited space, the MDOC states that it struggles with understaffing and budgetary constraints, all of which require defendant to set a limit on the number of group activities in MDOC facilities, religious and non-religious alike. *See id*. at 7-8.

As to the MDOC's means for furthering its interest in prison security and resource conservation, defendant contends that it lacks other feasible avenues for achieving these two goals. First, defendant argues that, given the MDOC's limited resources, "even if a fraction of additional group services are offered, this will inherently serve to amplify the above described resource[] concerns." *Id*. at 9. Second, the MDOC contends that its present restriction on Wiccan services is necessary to maintain prison security and order, as every gathering of prisoners presents

5

"inherent safety concerns," *see id.* at 9, and offering additional Wiccan services would "force the Department to discontinue other programs and religious services." *Id*. at 9-10. The MDOC states that Wiccans constitute only 1.2% of its prison population, and that "accommodating the present services for the entire prisoner population is critical to ensure [a] decrease [in] recidivism rates and [the] completion of required prisoner programs." *Id*. at 10.

Plaintiff argues that defendant's safety- and resource-based justifications for restricting Wiccan services are disingenuous because the MDOC "permit[s] far more gatherings to inmates of other recognized faiths." Pl.'s Br. at 3; *see also* Pl.'s Br. at 3-4 ("Table of 2020 Selected Group Religious Activities Permitted by MDOC"). Plaintiff argues that the disparities in the number of religious services allotted to each religion renders the MDOC policy at issue "impermissibly underinclusive." *Id*. at 5 (citing *Holt v. Hobbs*, 574 U.S. 352, 366-67 (2015)). Thus, plaintiff contends, the policy cannot be said to further a compelling interest. *See id.* at 6 (citing *Holt*, 574 U.S. at 366). Plaintiff adds that the "MDOC offers no evidence [or penological basis] to meet its burden to show that its differential treatment of Cavin and other Wiccans in its custody is necessary." *Id*. at 7. Further,

> [a]ccording to MDOC's data, inmates who formally identify as Wiccans make up 1.2% of MDOC inmates and are offered eight religious gatherings per year. Contrast with those who formally identify as Seventh Day Adventists, who comprise a comparable 1.1%, but are offered up to 54 gatherings per year at various MDOC facilities. Inmates who identify as Jehovah's Witnesses are at 1.6% and are offered 53; Jewish inmates are at 1.5% and are offered 69; Odinists are at 1.6% and are offered 52.

*Id*.

As to the narrowness of the means employed by the MDOC, plaintiff contends that the policy fails to satisfy "RLUIPA's exacting standard." *Id*. at 8. Rather, plaintiff argues, the

MDOC could offer "group Esbats under the ***same security-focused parameters it offers other religious gatherings***," which provide for the withdrawal of such privileges "if an inmate engages in prohibited or abusive conduct that undermines security." *Id*. at 9 (emphasis in original). Plaintiff notes that employing such a policy would still "result in fewer services offered [to Wiccans] than those offered other faiths," totaling what would be twenty to twenty-one MDOC-recognized Wiccan communal worship days per year. *Id*.

In its reply brief, defendant states that plaintiff's calculations as to religious service allotments is inaccurate. *Id*. at 3. The MDOC argues that the numbers shown in plaintiff's table reflect

> religious services offered at different facilities, on a monthly or weekly basis, which are subject to change, i.e. cancellation, pursuant to policy based on Chaplain determination. Indeed, some services listed may not currently be active at a given facility. Or, the services have temporarily changed and are without enough participants. This is different from the services that are uniformly offered across all facilities, annually, for holy holidays. And, based on holy holidays alone, Wiccans are provided with more dates of services than Seventh Day Adventists [(1.1% of inmates)] and the Sacred Name [(0.5% of inmates)].

*Id*. at 4 (citations omitted). Defendant adds that "the total number of practicing Wiccans pales in comparison to the number of prisoners in other religious groups," comparing the 468 Wiccan inmates to "15,623 Protestant prisoners or 41.2% [of inmates], 3,508 Catholic prisoners or 9.2% [of inmates], 2,830 Nation of Islam prisoners or 7.5% [of inmates], and 2,665 Muslim prisoners or 7.0% [of inmates]." *Id*. at 5. Given the number of prisoners, religious groups, and amount of non-religious programming, defendant states that it "cannot realistically provide a uniform number of religious group services to all religious groups." *Id*.

Upon review of the parties' briefs and relevant case law, the Court finds that

defendant has met its burden under RLUIPA. The Supreme Court has stated that

> Congress documented, in hearings spanning three years, that "frivolous or arbitrary" barriers impeded institutionalized persons' religious exercise. To secure redress for inmates who encountered undue barriers to their religious observances, Congress carried over from RFRA the "compelling governmental interest"/"least restrictive means" standard. Lawmakers anticipated, however, that courts entertaining complaints under [RLUIPA] would accord due deference to the experience and expertise of prison and jail administrators.

*Cutter v. Wilkinson*, 544 U.S. 709, 716-17 (2005) (internal quotation marks and citations omitted). In clarifying the proper balance between the state's burden under RLUIPA and the deference due to prison administrators, the Supreme Court has stated that

> [w]e do not read RLUIPA to elevate accommodation of religious observance over an institution's need to maintain order and safety. . . .
>
> While the Act adopts a "compelling governmental interest" standard, [c]ontext matters in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

*Id*. at 722-23 (internal quotation marks and citations omitted). *See also Holt*, 574 U.S. at 364 ("Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise.").

While some deference is owed to prison administrators, courts must nonetheless "apply RLUIPA's rigorous standard." *Id*. In the instant case, the Court finds that defendant has done what RLUIPA requires: narrowly tailor its restrictions on the exercise of plaintiff's religion

to serve compelling state interests. The MDOC's stated interests in ensuring security and preserving resources are compelling. Further, given the space, personnel, and funding limitations, combined with the wide variety of religious and non-religious prisoner programming, restrictions on the number of group religious services are unavoidable. While plaintiff suggests that the MDOC could offer "group Esbats under the same security-focused parameters it offers other religious gatherings," Pl.'s Br. at 9, this would not address defendant's resource-related concerns. Providing additional Wiccan services under the same security-focused parameters would result in the very resource drain that the MDOC states it cannot presently afford, and plaintiff does not suggest how this drain could be avoided.

Plaintiff contends that the RLUIPA violation in the present case lies not (or not only) in the limited number of Wiccan services per se, but rather in the disparate allotment of services to each religious group. However, according to the parties' briefs, the MDOC presently guarantees and facilitates more Wiccan gatherings on designated holy days, or "primary service days," than for similarly-sized religious groups[4] and far larger religious groups.[5] *See* Pl.'s Br. at 3-4 ("Table of 2020 Selected Group Religious Activities Permitted by MDOC"). *See also* Pl.'s Br. Ex. C. While most religious groups are also allotted weekly "secondary activities," according to the MDOC's 2020 Facility Religious Services and Activities Schedule, unlike primary service days, these secondary activities "may be cancelled at the Shift Commander's Discretion." *See*

---

[4] For example, Jehovah's Witnesses, which make up 1.1% of the inmate population, are allotted one primary service day, and Seventh Day Adventists, which made up 1.6% of the inmate population, are allotted two primary service days.

[5] For example, Muslims and members of the Nation of Islam, which make up 7% and 7.5% of the inmate population, respectively, are each allotted six primary service days.

Pl.'s Br. Ex. D at PageID.780-92. As stated in defendant's reply brief, plaintiff include these discretionary weekly activities in his worship day calculations. *See* Def.'s Reply at 3-4. For example, Seventh Day Adventists are allotted two primary service days and at least one secondary activity per week, allowing for as few as two, but as many as fifty-four, gatherings per year. However, the fifty-four gatherings are not guaranteed. The only guaranteed communal worship days are the two primary service days, as compared to the eight primary service days allotted to Wiccans.

Further, plaintiff's attempt to draw parallels between the instant case and *Holt* is misplaced. *Holt* involved an Arkansas state correctional policy that prohibited inmates from growing 1/2-inch beards. *See id.* at 355-56. The plaintiff in *Holt*, wished to "grow a 1/2-inch beard in accordance with his religious beliefs." *Id*. Because the government failed to meet its burden under the compelling-interest and least-restrictive-means test, the Supreme Court found the policy to be in violation of RLUIPA:

> Although the Department denied petitioner's request to grow a ½–inch beard, it permits prisoners with a dermatological condition to grow ¼–inch beards. The Department does this even though both beards pose similar risks. And the Department permits inmates to grow more than a ½–inch of hair on their heads. With respect to hair length, the grooming policy provides only that hair must be worn "above the ear" and "no longer in the back than the middle of the nape of the neck." Hair on the head is a more plausible place to hide contraband than a ½–inch beard—and the same is true of an inmate's clothing and shoes. Nevertheless, the Department does not require inmates to go about bald, barefoot, or naked. Although the Department's proclaimed objectives are to stop the flow of contraband and to facilitate prisoner identification, [t]he proffered objectives are not pursued with respect to analogous nonreligious conduct, which suggests that those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree.

*Id*. at 367-68 (internal quotation marks and citations omitted). The instant MDOC policy is not

similarly underinclusive. Without eroding other prisoner programming, which plaintiff does not appear to advocate, there is no alternative policy which would both allow more Wiccan gatherings and preserve scarce MDOC resources. The Court thus finds that defendant's policy limiting Wiccan gatherings, as it must for all inmate gatherings, survives strict scrutiny.

For the reasons stated above, the Court concludes that plaintiff's RLUIPA claim fails at the third prong of the analysis. Defendant's policy that permits Wiccans to worship communally eight times per year (and not on the additional twelve or thirteen days plaintiff requests) is narrowly tailored to serve compelling state interests.

SO ORDERED.

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
Dated: April 14, 2021  SENIOR UNITED STATES DISTRICT JUDGE
Detroit, Michigan